ABRAHAM V. VAN FLEET AND JOHN T. BIRD, ESQS.,
VICE-CHANCELLORS.

---

THE CHURCH OF ST. FRANCIS OF ASSISIUM

*v.*

PETER A. HARGOUS.

A bill sought to set aside a contract for the sale of lands on account of defendant's fraud. There was no evidence of fraud, but defendant had been mistaken as to the deeds conveying title to him. He offered to supply the defects.—*Held*, that he should be allowed a reasonable time to do so, and that failing in that, the contract should be set aside on the ground of mistake.

---

Bill for relief. On final hearing on pleadings and proofs.

339

Mr. J. H. Stewart, for complainant.

Mr. C. H. Corbin, for defendant, and defendant in pro. pers.

THE CHANCELLOR.

This suit is brought to set aside for fraud an agreement made between the parties on or about March 3d, 1883. The agreement, after reciting that the defendant, as grantee of Eugenia V. Hargous (his mother), sole legatee of Peter A. Hargous (his father), late of the city of New York, deceased, claimed as reversioner certain property on the corner of Market and Lamberton streets, in Trenton, conveyed by his father to the late Bishop Bayley May 24th, 1859, and that the complainant, as grantee of Bishop Bayley, claimed still to be in lawful possession of the premises, declared that, in order to reconcile those opposing claims and arrive at an arrangement satisfactory to both parties, and in consideration of $1, the parties agreed as follows: That the defendant should, on or before the 24th of March, 1883, convey to the complainant all his right, title and interest to the property, and that the complainant should thereupon execute and deliver to him at the same time a warranty deed for an undivided half part of those premises and of the adjoining lot on the easterly side thereof, being twenty-five feet in front on Market street, and one hundred and sixty feet deep, making the conveyance for one undivided half of the whole plot of ground eighty-five feet on the southerly side of Market street and one hundred and sixty feet on the easterly side of Lamberton street. And the complainant thereby covenanted and agreed with the defendant that the property would be free and clear of all encumbrances at the time of the execution of that deed. And it was thereby further agreed that the dead bodies then in the burial-ground on the plot should be removed therefrom by the complainant, and that the reasonable expense thereof should be paid by it and charged to the joint account of the ownership of the land, and one-half thereof allowed to the complainant out of the proceeds of the sale of the premises; that the contract for the work of removing those bodies should be given to Peter J. Har-

gous, of Trenton, at such reasonable compensation therefor as should be agreed upon between him and the complainant, and that the complainant, in the event of the old church on the property being taken down, should preserve the corner-stone thereof and set it up in some conspicuous place in the complainant's church, or such church as it might thereafter own, and place thereon some suitable inscription to memorialize the old church so taken down. And it was thereby further agreed that upon the execution and delivery of the deed therein provided for, the parties to the agreement should use their best endeavor to sell and dispose of the property to the best advantage, and should agree upon a proper plan to advance the sale, and that all proceeds therefrom should be divided equally between them, their legal representatives or assigns, after deducting all lawful expenses incurred or which might be incurred therefor. On the same day on which that agreement was made the complainant made a contract with Peter J. Hargous to remove the dead bodies for the consideration of $1,000 to be paid by it to him, of which sum it was to pay him, in weekly payments, so much as might be necessary to pay the expenses of the work, and the balance it was to pay him from the proceeds of the sale of the property. He did the work and received from the complainant $400 on account of the contract. He also received $200 more thereon, the amount for which the complainant sold the old church building, and which was paid to him.

The complainant alleges that the defendant falsely claimed that he was entitled to the property conveyed by his father to Bishop Bayley, because, as it insists, the property, notwithstanding the provision for reversion in that deed, was not in fact subject thereto, inasmuch as it was, when the defendant's father bought it, subject to a trust by which it was devoted to church uses, and therefore when he conveyed it to Bishop Bayley, on condition that it should be devoted to, and only to, the uses and purposes of Divine worship according to the rules and discipline of the Roman Catholic Church, or for the purposes of a burial-ground, school-house and parsonage attached to the church, and provided for a reversion to himself and his heirs and assigns on

breach of the condition, he had no lawful right to such reversion. It also charges that the defendant falsely and fraudulently claimed that he was the sole owner of such reversion, whereas, if it existed at all, he could only convey an estate therein for his mother's life. His father, by his will, gave the reversionary interest to her for life only, with power to appoint it after her death to and among his children or their descendants, and provided that in default of such appointment, it should go to his children in equal shares, with substitution of the descendants of any that should have died in the place of the decedent or decedents. The bill also charges that the defendant fraudulently sought to induce the complainant to remove the dead bodies and the church building from the property, so as to break the condition and thus give those claiming under his father's will a claim to the property under the reversionary provision in the deed. The complainant also alleges that the written agreement between the parties, which was drawn by the defendant, was not in accordance with the understanding between them, but the bill does not state in what respects it differed. The bill prays that the agreement may be set aside, and that the defendant may be decreed to pay the complainant the $400 paid to Peter J. Hargous by the complainant, and the $200 received by him on account of his contract from the sale of the church building.

The claim that the property was not subject to the provision for reversion contained in the deed from the defendant's father to Bishop Bayley is, as before stated, based on the allegation that the property was subject, in the hands of the grantor at the time of that conveyance, to a dedication to the same uses to which, by that deed, it was devoted. This claim is founded upon the following facts: Daniel W. Coxe, for the consideration of $420, conveyed the property September 30th, 1816, by deed of bargain and sale, with the usual covenants, to "John B. Sartori, president of St. John's Church of West Jersey, in trust for the Roman Catholic congregation." That church was not then incorporated. There was at that time no Roman Catholic diocese in

this state, nor any Roman Catholic bishop to take the title to church property. The deed was recorded and a church edifice was built on the lot for St. John's Church, and the property was used as a place of worship and a burial-place by and for that church for many years. On October 1st, 1816, Sartori, as president of the church, gave a mortgage on the premises to Coxe, which is still uncanceled. On February 1st, 1825, Sartori, as such president, gave another mortgage on the property to Rebecca Bettini. In that instrument the premises were not only particularly described, but were designated as a church and lot. On January 16th, 1832, Sartori, styling himself " formerly president " of the church (St. John's) conveyed the property to Archbishop Kenrick, of Philadelphia, in " trust for the Roman Catholic congregation of St. John's Church, of West New Jersey." On May 8th, 1839, the property was conveyed by the sheriff to William Skeen, pursuant to a sale under an execution out of this court on a decree of foreclosure of the Bettini mortgage. Pursuant to a sale under an execution on a judgment at law against Skeen, the property was conveyed by the sheriff in June, 1843, to Joseph B. Kennedy, who in July following conveyed it to Alexander C. M. Pennington, who conveyed it in November, 1847, to William Halsted, who, in February, 1848, conveyed it to Peter A. Hargous, the defendant's father, and he, in 1859, conveyed it as before mentioned to Bishop Bayley, who, in October, 1864, conveyed it to the complainant by the deed already referred to.

The legal title to the property, it will be seen, was in Sartori, who, as he lawfully could do, mortgaged it as president of the church. The church was not then incorporated. Had it then been a corporation and the title been in it, it could have made a valid mortgage of the premises, and a sale under it would have passed to the purchaser a title free from the trust. *Magie* v. *German Evangelical Church, 2 Beas. 77;* affirmed on appeal, *2 McCart. 500.* Peter A. Hargous, the defendant's father, had title to the property clear of the trust. Moreover, it may be remarked, the trust to which the property was subject in Sartori's hands was in favor of St. John's Church. The complainant is not that church

but another, a corporation created in September, 1864, and has no title, legal or equitable, to the property, except what it derives under the deed from Hargous to Bishop Bayley. There is therefore no substance in the complainant's claim that Hargous had no right to provide for a reversion of the premises on breach of the condition contained in his deed to Bishop Bayley, nor is there any ground for it.

But further, the misrepresentation complained of was not in reference to the fact of the existence of the reversionary interest. The complainant does not allege that the defendant falsely represented that there was a claim to reversion when in fact none existed. The fact that there was such a claim was known to the complainant before any of its officers saw or communicated with the defendant on the subject. It appeared on the face of the deed under which the complainant derived its title. Before the making of the application to the defendant, which was made in November, 1882, from which the agreement in question resulted, the complainant contemplated diverting the land from the uses to which it was devoted to sell it for its own benefit. As early as 1875 it obtained permission from the bishop of the diocese to tear down the church building and dispose of the property. When the agreement was made the complainant was desirous of selling the property. The building and fences on it had fallen into dilapidation. Rev. Mr. Ellison, the priest of St. Francis Church, and *ex officio* one of the trustees, testifies that the complainant wanted to sell the property. He says the object was to abate a nuisance and to utilize what was given for charitable purposes. All the propositions made on behalf of the complainant preceding the agreement were made with a view to selling the property. Nor could it be justly held that in the making of the agreement the complainant was *inops consilii*. It had counsel. In February preceding its solicitor had filed a bill in this court against the defendant's mother, to quiet title in respect to this very claim of reversion, and that suit was pending. The bill was not dismissed until March 2d, 1883. In January preceding, Mr. Ellison read the will with reference to this very

claim (for neither he nor the complainant had any other interest affected by it), in the surrogate's office in the city of New York.

There can be no doubt from the evidence that the agreement was the result of an application made on the part of the complainant to the defendant with a view to an amicable arrangement by which both the Hargous family and the church might receive benefit from the sale of the property on joint account. Not to speak particularly of an application made about a year previously to the defendant on behalf of the church, one was made to him in the city of New York, in November, 1882, for a release as a gratuity to the church. This proposition was declined, and in the latter part of February in the next year there was an interview between the defendant and Mr. Ellison and another member of the board of trustees, at which three propositions were made on the part of the complainant. The first was that the complainant should pay the defendant $1,500 for a quit-claim from the family. This was declined. The second, that the dead bodies should be removed from the property at joint expense, and the property be then sold and the proceeds equally divided between the parties. This also was declined. The third was that the defendant should pay the complainant $1,500 for its interest in or claim to the property. This, too, the defendant declined to accept. He thereupon himself made three propositions. The first was that the complainant should pay him $3,500 for the interest of the reversioners. This was declined. The second, that the complainant should remove the dead bodies at its expense, and then sell the property and pay him half of the proceeds of the sale. This, too, was declined. The third was that the complainant should put into joint account an adjoining lot of twenty-five feet front by one hundred and sixty feet in depth, of which the complainant claimed to be the owner, and remove the bodies at joint expense, and then sell the property and divide the proceeds equally between the parties. This was accepted. It was understood that the defendant was to draw the agreement, and he did so. The bill, as before stated, alleges that as drawn it varied from the verbal contract, but it does not specify wherein it differed. By the evidence on the

part of the complainant itself it appears that it was drawn in exact conformity with the verbal agreement, except that, as Mr. Ellison declares, the provision for a conveyance by the complainant to the defendant of half of the two lots was not part of the verbal contract. But the defendant swears that it was, and it is clear that any misunderstanding between them on that head must be attributed entirely to a misapprehension on the part of Mr. Ellison of the meaning of the language used by the defendant, for in his telegram of the 4th of April he says:

"We are ready to deliver you by Saturday warranty deed spoken of in agreement, but want you to deliver us quit-claim deed as spoken of in agreement."

He thus declares that the complainant is ready to deliver the deed in question. Moreover he himself drew a deed—the deed referred to in his telegram—from the complainant to the defendant, granting, bargaining and selling to him " and to his successors and assigns one undivided half part" of the two lots of land, describing them. This deed was, for an obvious reason, not satisfactory to the defendant. The conveyance was without words of inheritance, and was otherwise informal.

It would seem that Mr. Ellison understood what was meant by the provision for a deed in the agreement, for he drew that deed to comply with it. He swears, however, that the verbal agreement was that the complainant should give the appellant " a kind of warranty for the half of the proceeds of the sale of the land." He says, also, that he supposed that the effect of the deed he himself drew was merely to give the defendant security that he would receive half of the proceeds of sale. It is enough to say that if there was any misunderstanding on this subject, it arose entirely from Mr. Ellison's want of apprehension as to the plain meaning, not only of words which the defendant used in the agreement, but those which he himself employed in the deed which he drew in accordance with the agreement. It would appear that the provision for a warranty deed for land would be primarily understood by any one to signify precisely what the language imports—a conveyance of the land itself, and not merely a covenant to pay over the proceeds of the sale to the

St. Francis Church *v.* Hargous.

grantee.   He does not, however, in fact, allege that the agreement differed from the verbal understanding, but that he understood, by the words used in both in reference to the deed to the defendant, that they meant something else than what they plainly imported.   It may be added that the other trustee, Mr. Greenwald, who was present at the making of the verbal agreement, gave no testimony on the subject of the alleged variance.   There is obviously no ground for a claim to relief on this head.

But it is urged that the defendant fraudulently pretended that he was the owner of the entire interest of the Hargous family, under the reversion, while, in fact, he had only his mother's life estate, and whatever interest he might have been entitled to under his father's will as one of the children. , By the will, the testator gives to his wife, in fee, certain real property in the city of New York, and gives to her absolutely certain personal property also, and then gives to her all the residue of his estate for life, with power to appoint it by will, or instrument in the nature thereof, among his children, or to their descendants, in such shares as she shall think proper, and in default of such appointment gives it to his children, living at her death, in equal shares, the descendant or descendants of any deceased child to take the share which such deceased child would have taken if living ; and he authorizes her to advance, with the consent of his executors, to any of his children of lawful age, such part of the share which such child would be entitled to under the will if living at the death of his wife, in default of any appointment by her, as she and his executors may think discreet.   He then gives to his executors or such other person or persons as shall, by law, be appointed to administer upon his estate, full power and authority, by and with the consent of his wife, to sell and convey all or any part of his real estate, upon such terms and in such manner as they may deem advisable.   He appointed his wife and his brother, Louis E. Hargous, executors.   The will was proved in New York in 1866, by Louis E. Hargous, but has not been proved in this state.   By deed dated March 9th, 1881, the widow conveyed her interest in the church property to the defendant.   When he made the agreement he held no other title than that, except

his interest under the will as one of the children. By the agreement, he agreed to convey all his right, title and interest to the property. He then supposed that under and by virtue of the conveyance from his mother he held a complete title, and the complainant's trustees also understood that his title was complete. That deed was not recorded until January, 1883. It was acknowledged according to the requirements of the laws of New York, but was not properly acknowledged to be recorded in this state. It went on record, however, nevertheless. It stated that Mr. Hargous was sole legatee [devisee] under the will. In the spring of 1883, the defendant ascertained that it passed only a life estate, and he then got a deed from the executors—both of them—to him for the property. That deed was acknowledged in the same way as the other, and, like it, was recorded here notwithstanding the defect in the acknowledgment. The defendant says he intended, by his agreement, to stipulate to pass a complete title to the reversionary interest, and thought he then had it; that no objection was ever made to his title on any specific ground; that if there had been, he would have supplied the defect, and that he can now convey a good title, and is ready to fulfill the agreement on his part whenever the complainant is prepared to perform it. It is worthy of remark here that the complainant, at the time of making the agreement, had no title, as it subsequently ascertained, to the lot adjoining the church lot, and did not get one until April, 1883. The allegations of fraud made in the bill against the defendant, though numerous and vigorously made, are in no wise sustained, and are groundless. He does not appear to have acted unfairly in any way. The charge that he took advantage of his legal knowledge and the confidence reposed in him by Messrs. Ellison and Greenwald because he was a Roman Catholic, is wholly unsupported by the evidence. And here it will not be out of place to refer to the fact that stress is laid by the complainant on the omission by the defendant to acknowledge the agreement. Because of this omission the complainant could not put it upon record, and it is urged that the omission is cogent evidence of fraud on the part of the defendant. But there is no evidence of

fraud in that. He was under no obligation to acknowledge it, especially in the absence of any request to do so. The fact is that he drew the agreement, and sent the draft of it to Mr. Ellison. Having learned that it was satisfactory, he went to Trenton and signed one of the two papers (he had drawn the agreement in duplicate) and left it with Mr. Ellison, with the understanding that it was to be signed by the other parties, and sent to him, and that he was then, in return, to send them the other signed by himself. He afterwards sent the latter paper duly signed by himself, with a request that they would sign it, and return it to him, but neither paper was ever sent to him, and no reason was given him for not complying with the promise to send him one of them.

Nor is the complainant, as the case now stands, entitled to any relief on the ground of mistake. Both parties were mistaken when the agreement was made, each as to his or its title. The time fixed by the agreement for the delivery of the deeds was the 24th of March, 1883. At that time neither party was ready to carry out the agreement. The complainant had no title to the lot adjoining the church lot, and the defendant had only his mother's life estate and his own interest as one of the children in the reversionary interest in the latter property. Both parties acquiesced in postponing the delivery of the deeds. On the 4th of April, 1884, Mr. Ellison telegraphed that the complainant would be ready to deliver its deed on the ensuing Saturday. By letter of the next day the complainant's attorney requested the defendant to furnish a copy of his deed and a copy of the will, to enable the former to pass upon the title. The request was complied with at once, but the defendant did not hear further from the matter until the bill in this cause was filed, which was on the 18th of the very next month. The suit, it may be remarked, is not brought to rescind the agreement, but to set it aside for fraud.

The defendant was, indeed, mistaken as to the extent of his title, but he proceeded, as soon as he ascertained the fact, to obtain a complete title, and he succeeded. The deed from the executors to him was acknowledged on the 12th of March, 1883;

so that he had title to the property then.  The reversionary interest passed by the will (*Rev. p. 167 § 82*), and the executors had power to sell with the widow's consent, and she joined with her co-executor in that deed.  But the evidences of the defendant's title were not satisfactory.  The complainant should have pointed out to him the defects and given him an opportunity to remedy them.  It did not do so, but appears to have concluded that his conduct in the whole matter was fraudulent, and, without warning to him, began this suit.  The evidences of his title are not such as that the complainant should have been required to accept them, but he says he can and will supply the defects, and there appears to be no reason to doubt his ability or to question his sincerity.  He should have an opportunity to fulfill his contract according to his and the complainant's understanding of it; that is, he should have an opportunity to tender satisfactory conveyance to the complainant of the entire reversionary interest. If he does not do so within a reasonable period, the agreement should be set aside on the ground of mistake.  The question of costs is reserved.